UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JO JORGENSEN, Libertarian Party of Maine Candidate for U.S. President,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW DUNLAP, in his official capacity as the Secretary of the State of Maine.<br><br>Defendant. | **Case No.**<br><br>**COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND OTHER RELIEF** |

INTRODUCTION

1. Plaintiff Jo Jorgensen, the Libertarian Party of Maine candidate for U.S. President, by and through her counsel, Barnes Law, and pursuant to the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, states the following complaint for declaratory judgment and permanent, preliminary, and emergency injunctive relief against Matthew Dunlap, in his official capacity as the Secretary of State of Maine, to restrain him, in this election only as a result of the COVID-19 pandemic, from enforcing in full the petition signature requirements for independent candidates to the U.S. presidency found at 21-A M.R.S. §§ 353 and 354(5)(A). Plaintiff requests this Court, in light of the COVID-19 pandemic, lower the petition signature requirement found in 21-A M.R.S. § 354(5)(A) from 4,000 to 2,000.

1

## PARTIES

2. Plaintiff Jo Jorgensen is the Libertarian Party of Maine ("LPME") candidate for U.S. President, a petition circulator and voter. The LPME is a political party and the Maine affiliate of the national Libertarian Party that seeks to have its candidate for U.S. President on the Maine ballot for the 2020 general election.

3. Defendant Matthew Dunlap is the Secretary of State of Maine and is charged with enforcing and administering Maine election laws, including the petition signature requirements for independent candidates for the 2020 general election.

4. Defendant Dunlap is specifically empowered by Maine statute to determine if independent candidates for the U.S. presidency have collected the required number of valid signatures necessary to secure access to Maine's 2020 general election ballot.

5. At all relevant times herein, Defendant Dunlap was engaged in state action under the color of state law.

6. Defendant Dunlap is being sued in his official capacity for declaratory and injunctive relief under 42 U.S.C § 1983 and 28 U.SC. § 2201, as well as costs and attorney's fees under 42 U.S.C. § 1988(b).

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

8. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendant resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

### A. The COVID-19 Pandemic and Maine's Response

10. In December 2019, an outbreak of respiratory disease caused by a novel coronavirus emerged in Wuhan, China. It is an infectious disease, now known as "COVID-19," that can spread from person to person and can result in serious illness and death. According to the Centers for Disease Control and Prevention, older adults (particularly those over 65) and people of any age who have serious underlying medical conditions (including asthma, heart disease, cancer, and diabetes) may be at higher risk for severe illness from COVID-19.

11. On January 30, 2020, after the coronavirus outbreak had spread well beyond China, the World Health Organization (WHO) declared that COVID-19 constituted a Public Health Emergency of International Concern.[1] The next day, as a result of confirmed cases of COVID-19 in the United States, Health and Human Services Secretary Alex M. Azar II declared a nationwide public health emergency retroactive to January 27, 2020.[2]

12. Immediately thereafter, public health officials in the United States began taking aggressive measures to stop the spread of the disease. They began to warn the public about the possibility of severe disruption from COVID-19 outbreaks in the United States, and they urged

---

[1] World Health Organization Newsroom; (January 30, 2020); *Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)* (https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov)).
[2] Health and Human Services Press Office; (January 31, 2020); *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus* (https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html).

cities and towns to begin preparing for social-distancing measures like school closures and meeting cancellations.

13. On March 11, the World Health Organization declared COVID-19 to be a global pandemic.[3] Two days later, the President of the United States declared a national emergency (retroactive to March 1, 2020) due to the COVID-19 outbreak in the United States.[4]

14. On March 15, 2020, Maine Governor Janet T. Mills proclaimed a state of emergency authorizing the Governor to exercise emergency powers in order to expand and expedite Maine's response to the threats posed by COVID-19.[5]

15. On March 18, 2020, Governor Mills issued Executive Order 14 FY 19/20 ordering that gatherings of more than 10 people were prohibited throughout the state.[6] Gatherings subjected to this Order were those that were primarily social, personal and discretionary events other than employment. *Id*. Such gatherings included, without limitation, community, civil, public, leisure, and faith-based events; social clubs; sporting events with spectators; concerts, conventions, fundraisers, parades, fairs, and festivals; and any other similar event or activity in a venue such as an auditorium stadium, area, large conference room, meeting hall, theater, gymnasium, fitness center or private club. *Id*. The Order further closed all restaurants' and bars' dine-in facilities. The Order made no exceptions for First Amendment activity. *Id*.

---

[3] World Health Organization; (March 11, 2020); *WHO Director-General's opening remarks at the media briefing on COVID-19* (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).
[4] White House; (March 13, 2020); *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).
[5] Maine.gov; (March 15, 2020); *Proclamation of State of Civil Emergency to Further Protect Public Health* (https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/Proclamation%20of%20State%20of%20Civil%20Emergency%20To%20Further%20Protect%20Public%20Health.pdf).
[6] Maine.gov; (March 18, 2020); *An Order to Protect Public Health* (https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/EO%2014%20An%20Order%20to%20Protect%20Public%20Health.pdf).

16.     On March 23, 2020, Governor Mills issued Executive Order 18 FY 19/20 extending, among other things, the expiration dates and fees required by 29-A M.R.S. § 1406-A of all driver's licenses, both commercial and noncommercial, and non-driver identification cards required by 29-A M.R.S. § 1410 due to expire during the period of emergency until 30-days after the termination of the emergency.[7]

17.     On March 24, 2020, Governor Mills issued Executive Order 19 FY 19/20 further restricting commercial activity and public gatherings and extending public social distancing requirements through more detailed regulation and definition of Essential and Non-Essential Businesses and Operations.[8]  The social distancing order details the need for businesses covered by the order to make all best efforts to implement and actively enforce social distancing requirements in and around their facilities including but not limited to: (1) designate with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance; (2) have hand sanitizer and sanitizing products readily available for employees and customers; (3) implement separate operating hours for elderly and vulnerable customers; and (4) post online whether a facility is open and how best to reach the facility and continue services by phone or remotely. *Id*.

18.     On March 31, 2020, Governor Mills issued Executive Order 28 FY 19/20 containing a "Stay at Home" Order, effective 12:01 AM on April 2, 2020, for all persons living in the State of Maine ordering:  Residents to stay at their homes or places of business or places of residence except: (1) to conduct or participate in an Essential Activity (as defined therein by Executive

---

[7] Maine.gov; (March 23, 2020); *An Order Extending Compliance Dates Under Certain Motor Vehicle Laws*; (https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/EO%2018%20An%20Order%20Extending%20Compliance%20Dates%20Under%20Certain%20Motor%20Vehicle%20Laws.pdf).

[8] Maine.gov; (March 24, 2020); *An Order Regarding Essential Businesses and Operations;* (https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/An%20Order%20Regarding%20Essential%20Businesses%20and%20Operations%20_0.pdf).

Order 28FY 19/20); (2) workers at Essential Businesses and Operations not required to close pursuant to Executive Orders 19FY 19/20 could travel: (a) between their Homes and those businesses and organizations; (b) to and from child care; and (c) to and from customers for the purpose of delivering goods or performing services; and (3) workers of Non-Essential Businesses and Operations under executive Orders 19FY 19/20 could travel: (a) between their Homes and those Non-Essential Businesses for the purpose of engaging in Minimal Operations; and (b) to and from customers for the purpose of delivering goods.[9]

19. On April 3, 2020, Governor Mills issued Executive Order 34 FY 19/20 requiring residents and non-residents traveling from outside the State to self-monitor and home quarantine for a period of 14 days, and restricting the operation of hotels and lodging to housing only (a) vulnerable populations; (b) health care workers, or other workers deemed necessary to support public health, safety or critical infrastructure; (c) individual self-quarantine facilities as arranged by the State; and (d) verifiable extenuating circumstances for the care and safety of residents as otherwise approved by the state.[10] The Order further instructed individuals from cities and regions identified as COVID-19 "hot spots" such as the cities of Detroit, Chicago, and New York and the States of New York, New Jersey and Connecticut to not travel to Maine. *Id*.

20. On April 8, 2020, Governor Mills issued Executive Order 37 FY 19/20 temporarily modifying certain in-person notarization and acknowledgement requirements permitting the act of notarization and witnessing required by Maine law to be completed remotely via two-way

---

[9] Maine.gov; (March 31, 2020); *An Order Regarding Furhter Restrictions on Public Contact and Movement, Schools, Vehicle Travel and Retain Business Operations*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/Corrected%202_%20An%20Order%20Regarding%20Further%20Restrictions%20on%20Public%20Contact%20and%20Movement%2C%20Schools%2C%20Vehicle%20Travel%20and%20Retail%20Business%20Operations_0.pdf).

[10] Maine.gov; (April 3, 2020); *An Order Establishing Quarantine Restrictions on Travelers Arriving in Maine*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/EO%2034.pdf).

audio-video communication technology.[11] However, Executive Order 37 FY 19/20 explicitly excludes the acknowledgement, witnessing and the in-person notarization of the "administering oaths to circulators of state or local direct initiative or referendum petitions and nomination petitions of candidates for electoral office", thereby exposing election related petition circulators to an increased threat of contracting COVID-19. *Id*.

21. On April 10, 2020, Governor Mills issued Executive Order 39 FY 19/20 postponing Maine's 2020 primary election from June 2, 2020 to July 14, 2020 to "reduce the exposure to COVID-19."[12] As part of Order 39 FY 19/20, Governor Mills also extended all relevant statutory deadlines set in relation to the date of the elections to be automatically "reset to the new election date of July 14, 2020." *Id*.

22. On April 29, 2020, Governor Mills issued Executive Order 49 FY 19/20, which extended the emergency rules of Executive Orders 14, 19, 28 and 34 to May 31, 2020.[13]

23. On May 29, 2020, Governor Mills issued Executive Order 55 FY 19/20, which, as part of Governor Mill's Restarting Plan, relaxed the restriction on public gatherings from 10 to 50 persons and eased restrictions on restaurants and bars, but continued to encourage Mainers to work from home when able and continue to limit their public movement and activities.[14]

---

[11] Maine.gov; (April 8, 2020); *An Order Temporarily Modifying Certain In-Person Notarization and Acknowledgement Requirements*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/EO37.pdf)
[12] Maine.gov; (April 10, 2020); *An Order Modifying the Primary Election to Reduce Exposure to COVID-19*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/An%20Order%20Modyifying%20the%20Primary%20Election%20to%20Reduce%20Exposure%20to%20COVID-19.pdf).
[13] Maine.gov; (April 29, 2020); *An Order to Stay Safer at Home*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/An%20Order%20to%20Stay%20Safer%20at%20Home.pdf).
[14] Maine.gov; (May 29, 2020); *An Order to Further Implement the Restarting Plan*;
(https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/An%20Order%20to%20Further%20Implement%20the%20Restarting%20Plan.pdf).

### B. Maine's Ballot Access Procedure for Independent Candidates

24. Maine classifies general election candidates into two groups: Primary (Party) Candidates and Non-Party Candidates.[15]

25. A political party meeting the qualifications of 21-A M.R.S. c.5 is eligible to participate in the primary election with the winning candidate from each qualified party automatically placed on the general election ballot.[16]

26. All other candidates, including independent candidates for the U.S. presidency, must collect a certain number of valid signatures from registered Maine voters on nomination petitions called Nomination by Petition (Non-Party), in order to secure access to the 2020 Maine general election ballot.[17]

27. Independent candidates seeking to qualify for Maine's 2020 general election ballot must also file a Consent of Petition (Non-Party) Candidate.[18]

28. Nomination petitions for independent candidates for the U.S. presidency may only be circulated starting on January 1st of the year of the election.[19]

29. Nomination petitions may only be signed by registered Maine voters.[20]

30. Each voter signing a nomination petition "must personally sign their name in such a manner as to satisfy the register of his municipality that he is a registered voter." Additionally, either the voter or the circulator of the petition must print the voter's name.[21]

---

[15] *State of Maine 2020 Candidate's Guide to Ballot Access* at pp. 8-22.
[16] *State of Maine 2020 Candidate's Guide to Ballot Access* at p. 8, 25.
[17] See, 21-A M.R.S. §§ 353, 354.
[18] See, 21-A M.R.S. § 355.
[19] See, 21-A M.R.S. § 354(6).
[20] See, 21-A M.R.S. § 354(2).
[21] See, 21-A M.R.S. § 354(3).

31.     In Maine, access to the general election ballot through Nomination by Petition (Non-Party) requires independent candidates for the U.S. presidency to collect a minimum of 4,000 and a maximum of 6,000 valid signatures to secure ballot access.[22]

32.     Collecting signatures by hand, on paper nomination petitions, is inherently burdensome, labor-intensive and inefficient as a means of demonstrating voter support. Many signatures are often invalidated due to illegibility, missing information and other mere technical defects. This obligates candidates and political parties to collect at least 25% to 50% more signatures than required, in order to account for those signatures that might be later invalidated. In fact, the Maine statute recognizes that at least 50% additional signatures above the minimum required should be collected by permitting the collection and filing of up to 6,000 signatures to meet the minimum 4,000 valid signature threshold necessary to secure ballot access for independent candidates for the U.S. presidency. *Id*.

33.     After signatures are collected the circulator of a nomination petition must verify by oath or affirmation before a notary public or other person authorized by law to administer oaths or affirmations that the circulator personally witnessed all of the signatures to the petition and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be.[23]

34.     Nomination petitions for independent presidential candidates must be submitted to the registrar (or clerk at the request or upon the absence of the registrar), for certification by 5 p.m. on July 25 of the election year.[24]

35.     Once nomination petition signatures are certified, the nomination petition must then be filed with Defendant no later than 5 p.m. on August 1st of the election year.[25]

---

[22] See, 21-A M.R.S. § 354(5)(A).
[23] See, 21-A M.R.S. § 354(7)(A).
[24] See, 21-A M.R.S. § 354(7)(B)&(C).

36. For a candidate to qualify for the ballot, a nomination petition must meet all of the requirements set forth in 21-A M.R.S. §354.[26]

### C. Plaintiff's Signature Gathering Efforts Hampered by the COVID-19 Pandemic

37. Third parties and independent candidates for president in a normal election year have access to significantly less resources, personnel, and equipment. Their campaigns rely on boots-on-the-ground volunteer work and community outreach.

38. The COVID-19 outbreak has made the already arduous path to ballot access for third party and independent candidates for president now impossible.

39. First, petition signatures are typically collected during the spring and summer at public events and festivals. However, this year, due to the COVID-19 pandemic and ongoing social distancing mandates from Governor Mills, the vast majority of public events scheduled for the spring and summer in Maine were cancelled.[27]

40. Second, general public reluctance to engage in the sort of physical contact required to sign a petition has resulted in many of Plaintiff's petition circulators being immediately rejected upon attempting to solicit signatures.

41. Third, primary election day petitioning at the polling places typically represents an outsized portion of Plaintiff's signature gathering efforts, but this year those efforts were hampered by Governor Mills and the COVID-19 pandemic. The increased number of absentee voters resulted in far fewer individual voters traveling to the polls and thus far less voters signing petitions. Further, Governor Mills mandated that all petition circulators must stand outside the polling place instead of at their usual tables indoors. This not only greatly hindered petition

---

[25] See, 21-A M.R.S. § 354(8)(A).
[26] See, 21-A M.R.S. § 354(9).
[27] Burnham, Emily; Bangor Daily News (April 29, 2020); *Here's a list of the Maine parades, festivals and concerts that have been scrapped for 2020*; (https://bangordailynews.com/2020/04/29/news/bangor/bangors-memorial-day-parade-has-been-canceled/).

circulators ability to intercept and solicit signatures from voters, but given the heavy rain that fell across most of Maine that day, it led to the actual destruction of several petition sheets.

42.     Fourth, as a result of the COVID-19 pandemic and the Governor's executive orders in response, Plaintiff's campaign was unable to hire enough professional petition circulators and notaries. On more than one occasion, notaries and circulators refused to work citing that the Governor had not opened up the state to the public. Additionally, on more than one occasion a petition circulator was denied a hotel room due to the ongoing restrictions.

43.     Fifth, Maine's requirement that signature petitions be turned into each individual town hall for certification prior to being turned in to the Secretary of State, has resulted in unnecessary difficulties and hampered Plaintiff's ability to turn in signatures during the COVID-19 pandemic. Due to the COVID-19 pandemic, many town halls are operating on reduced hours and interact with the public by appointment only, with many closed entirely. Plaintiff's campaign has collected signatures from more than 285 towns, but as a result of the COVID-19 pandemic, ongoing social distancing restrictions, reduced town hall hours and days of operation, and appointment-only mandates, the campaign has experienced significant delays and complications in receiving the certified petition sheets, which further reduces the amount of signatures that will be submitted to the Secretary of State.

44.     Plaintiff's campaign began its efforts to collect petition signatures as soon as it was able, January 1, 2020; however, as a result of the above, Plaintiff's campaign was only able to collect 4,400 unverified petition signatures. Thus, Plaintiff believes, that absent relief from this Court, once signatures are verified, she will not have enough signatures to qualify her to appear on Maine's 2020 general election ballot.

### D. U.S. Constitutional Law

45. The First Amendment declares in no uncertain terms that Congress shall make no law abridging the freedom of speech. U.S. Const. amend. I. *See also Citizens United v. FEC*, 558 U.S. 310, 336 (2010). This restriction against governmental power is applied to the states through the Fourteenth Amendment. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

46. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).

47. The Supreme Court has made clear, "whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters … state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny" *Id*. at 460-61.

48. The right to "voluntary political association … is an important aspect of the First Amendment freedom" that the Supreme Court "has consistently found entitled to constitutional protection." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 (1977).

49. A person's ability to exercise their rights guaranteed under the First Amendment is "[u]ndeniably enhanced by group association." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (quoting *NAACP v. Alabama*, 357 U.S. at 460.

50. Ballot restrictions that severely burden the right to vote and associate violate the First Amendment to the U.S. Constitution. See *Storer v. Brown*, 415 U.S. 724, 728-29 (1974).

51. Accordingly, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms. If the State has open to it a less drastic way of satisfying

its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) (internal quotation marks and citations omitted).

52. Therefore, in recognizing that States must enact election codes for orderly, fair, and honest elections, courts reviewing challenges to ballot access cases impose a flexible standard. *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). If the election regulation imposes a severe burden, then the regulation must survive strict scrutiny. *Id*. at 434. By contrast, if the election regulation imposes a light burden, rational basis or intermediate scrutiny applies. *Id*.

53. Under the current conditions created by COVID-19, including a declared state of emergency in the state, Governor Mill's Stay At Home Order, as well as a declared National emergency, Maine's signature requirement imposes a severe burden on Plaintiff.

54. This burden is compounded because of the various government recommendations that individuals maintain at least six feet distance between them.

55. In analogous situations, courts have extended voter registration deadlines in light of natural disasters, such as hurricanes. *See Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016). In that court's analysis of the burden, the court noted that in the final week before voter registration closed, an estimated 100,000 people were expected to register. *Id*. at 1257. But because of Hurricane Matthew, these potential voters were forced to flee the State. *Id*. Thus, these potential voters could not vote because they were unregistered. *Id*. Florida's voter registration statute imposed a severe burden that it could not justify. *Id*.

56. Because the inability to register to vote meant these 100,000 people could not vote, the court ruled that was a severe burden. *Id*.

57. Florida could not justify its severe burden because, similar to here, several other states impacted by Hurricane Matthew either extended their voter registration deadlines or permitted voter registration on Election Day. *Id*. Accordingly, under the flexible approach explained in *Burdick*, the court ruled that under any standard, Florida could not justify its decision not to extend voter registration in light of Hurricane Matthew. *Id*. at 1257-58; *see also Ga. Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016) (ordering an extension of voter registration deadline due to Hurricane Matthew because the loss of the right to vote would be an irreparable harm and when balanced to the administrative burden of extending registration deadline, the harm to voting rights outweighed the administrative burden).

58. Accordingly, Maine does not have a compelling or even sufficiently important interest to justify maintaining its 4,000-signature requirement in light of the current public health emergency.

59. At all times stated herein Defendant was acting under color of state law.

## CLAIMS FOR RELIEF

## COUNT ONE

**(Violation of First and Fourteenth Amendment Rights, Equal Protection – 1983 Action)**

60. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61. The First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

62. The First Amendment's guarantees of freedom of speech, freedom of the press, freedom of assembly, freedom of religion, and freedom to petition for redress of grievances are applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution.

63. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges, or immunities secured by the Constitution and laws," shall be liable to the injured party.

64. Defendant's actions effectively prohibit Plaintiff from obtaining the required number of signatures, and in turn, prevents her from having her name placed on the ballot in violation of her freedom of speech and association, equal protection, and due process rights as guaranteed by the First and Fourteenth Amendments, and as enforced by 42 U.S.C. § 1983.

65. Because of the relevant Declarations of Emergency and Governor Mills' executive orders, it is impracticable for Plaintiff and her campaign to obtain 4,000 verified petition signatures.

66. Because of the relevant Declarations of Emergency and Governor Mills' executive orders, Maine's petition signature requirements are overly broad, in no way narrowly tailored, and deprive Plaintiff of her First and Fourteenth Amendment Rights.

67. Defendant has no governmental interest so compelling as to justify the denial of Plaintiff's rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

68. Defendant has less restrictive means by which his interests could be met.

69. Plaintiff has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her constitutional rights.

70. Plaintiff is therefore entitled to declaratory and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A. To immediately issue a temporary restraining order, followed by a preliminary injunction, and ultimately a permanent injunction, requiring Defendant, his officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with him, to reduce the petition signature requirement found in 21-A M.R.S. § 354(5)(A) from 4,000 to 2,000.

B. To enter a judgment declaring 21-A M.R.S. §§ 353 and 354(5)(A) as written violate the First and Fourteenth Amendments to the U.S. Constitution as applied to independent candidates during this particular election;

C. To award Plaintiff her attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

D. To grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

MAHANY LAW PARTNERS LLC

/s/ Brian Mahany
Brian Mahany, Bar #003269
8112 W. Bluemound Road, Ste 101
Wauwatosa WI 53213
(414) 258-2374 – Office
(414) 704-6731 – Direct
brian@mahanylaw.com
*Local Counsel for Plaintiff*

BARNES LAW, LLP

/s/ Robert E. Barnes
Robert E. Barnes, CA SBN #235919
*Pro Hac Vice to be filed*
5251 Highway 153, Suite C #354
Hixson, TN 37343
(310) 510-6211 – Main
(310) 510-6225 – Fax
robertbarnes@barneslawllp.com
*Attorneys for Plaintiff*