## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JO JORGENSEN, Libertarian Party of Maine Candidate for U.S. President, | |
| Plaintiff, | |
| | **Case No.** |
| v. | |
| | **PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AND REQUEST FOR EXPEDITED HEARING** |
| MATTHEW DUNLAP, in his official capacity as the Secretary of the State of Maine. | |
| Defendant. | |

Pursuant to Federal Rules of Civil Procedure 65(a) and (b), and in view of the public health crisis precipitated by the coronavirus pandemic known as COVID-19 and the ensuing emergency measures adopted by the State of Maine, Plaintiff respectfully moves the Court to enter a preliminary injunction and/or temporary restraining order that prohibits Defendant from enforcing or applying those provisions of the Maine Revised Statutes that require Plaintiff, as a condition of qualifying for the general election ballot, to collect a specified number of registered voters' signatures on petitions. Plaintiff specifically request that the Court enter a preliminary and then permanent injunction requiring Defendant, in light of the difficulties created by the COVID-19 pandemic and in keeping with relief granted by neighboring states, to accept 2,000 validated signatures, which represents a 50% discount off of the statutorily required 4,000.

Plaintiff certifies that counsel for Defendant has been contacted and provided copies of the Complaint, this Motion, the supporting declarations and exhibits, and Plaintiff's Proposed Order. Plaintiff has requested of Defendant's counsel a waiver of service of process under Federal Rule of Civil Procedure 4.

**REQUEST FOR EXPEDITED HEARING**

Plaintiff seeks emergency treatment of this Motion, as timing in this case is critical. Nomination petitions must be delivered to the state by August 3, 2020, and the Defendant has indicated that they must finalize the Maine ballot by August 28, 2020.

Dated: July 30, 2020

Respectfully submitted,

MAHANY LAW PARTNERS LLC

/s/ Brian Mahany
Brian Mahany, Bar #003269
8112 W. Bluemound Road, Ste 101
Wauwatosa WI 53213
(414) 258-2374 – Office
(414) 704-6731 – Direct
brian@mahanylaw.com
*Local Counsel for Plaintiff*

BARNES LAW, LLP

/s/ Robert E. Barnes
Robert E. Barnes, CA SBN #235919
*Pro Hac Vice to be filed*
601 South Figueroa Street, Suite 4050
Los Angeles, CA 90017
(310) 510-6211 – Main
(310) 510-6225 – Fax
robertbarnes@barneslawllp.com
*Attorneys for Plaintiff*

**MEMORANDUM OF LAW IN SUPPORT**

Plaintiff comes before this Court requesting that it order the Defendant to acknowledge a simple truth that has already been accepted by courts and election officials across the country: statutes requiring candidates to gather a certain number of petition signatures to appear on the ballot cannot withstand constitutional scrutiny when the state is engulfed in a global pandemic. Plaintiff is the Libertarian Party of Maine's candidate for U.S. president and is asking this Court to enter a preliminary injunction requiring the state to accept 2,000 verified petition signatures in order to place her on the 2020 general election ballot. This 50% reduction from the statutory amount is both in line with relief provided by neighboring states and represents a fair acknowledgment of the fact that out of 215 available petitioning days, 138 occurred while Maine was under a state of emergency due to an infectious disease, and 51 occurred while Maine residents were under a "stay at home" order. Plaintiff's request is further justified by the fact that the COVID-19 pandemic continues to engulf Maine, which has a total of 3,866 confirmed cases, with 30 new cases reported just yesterday. Lastly, Plaintiff's requested relief should be granted because 2,000 petition signatures is enough to guarantee that Defendant can uphold its duty to protect the integrity of Maine's elections and ensure that candidates have a sufficient modicum of support as evidenced by the fact that larger states require less signatures and Maine requires less signatures for other political offices.

**FACTS**

A.      **Maine's Ballot Access Requirements for Independent Candidates**

Even during a typical election cycle, Maine's statutory scheme presents independent candidates for office with significant challenges that are not required of major party candidates. Maine classifies general election candidates into two groups: Primary (Party) Candidates and

Non-Party Candidates.[1] A political party meeting the qualifications of 21-A M.R.S. c.5 is eligible to participate in the primary election with the winning candidate from the party automatically placed on the general election ballot.[2] All other candidates, including independent candidates for the U.S. presidency, must collect a certain number of valid signatures from registered Maine voters on nomination petitions titled "Nomination by Petition (Non-Party)", in order to secure access to the 2020 Maine general election ballot.[3] Independent candidates seeking to qualify for Maine's 2020 general election ballot must also file a Consent of Petition (Non-Party) Candidate.[4] Nomination petitions for independent candidates for the U.S. presidency may only be circulated starting on January 1st of the year of the election.[5] Nomination petitions may only be signed by registered Maine voters.[6] Each voter signing a nomination petition "must personally sign their name in such a manner as to satisfy the register of his municipality that he is a registered voter." Additionally, either the voter or the circulator of the petition must print the voter's name.[7]

In Maine, access to the general election ballot through Nomination by Petition (Non-Party) requires independent candidates for the U.S. presidency to collect a minimum of 4,000 and a maximum of 6,000 valid signatures to secure ballot access.[8] Collecting signatures by hand, on paper nomination petitions, is inherently burdensome, labor-intensive and inefficient as a means of demonstrating voter support. Many signatures are often invalidated due to illegibility, missing information and other mere technical defects. This obligates candidates and political parties to collect at least 25% to 50% more signatures than required, in order to account for those signatures that might be later invalidated. In fact, the Maine statute recognizes that at least 50%

---

[1] *State of Maine 2020 Candidate's Guide to Ballot Access* at pp. 8-22.
[2] *State of Maine 2020 Candidate's Guide to Ballot Access* at p. 8, 25.
[3] See, 21-A M.R.S. §§ 353, 354.
[4] See, 21-A M.R.S. § 355.
[5] See, 21-A M.R.S. § 354(6).
[6] See, 21-A M.R.S. § 354(2).
[7] See, 21-A M.R.S. § 354(3).
[8] See, 21-A M.R.S. § 354(5)(A).

additional signatures above the minimum required should be collected by permitting the collection and filing of up to 6,000 signatures to meet the minimum 4,000 valid signature threshold necessary to secure ballot access for independent candidates for the U.S. presidency. *Id*. After signatures are collected the circulator of a nomination petition must verify by oath or affirmation before a notary public or other person authorized by law to administer oaths or affirmations that the circulator personally witnessed all of the signatures to the petition and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be.[9]

Maine also creates a unique burden for independent candidates for office by requiring that they have their petition signatures verified by the local registrar of each individual municipality prior to turning over the signatures to Defendant.[10] Once nomination petition signatures are certified, the nomination petition must then be filed with Defendant no later than 5 p.m. on August 1st of the election year.[11] For a candidate to qualify for the ballot, a nomination petition must meet all of the requirements set forth in 21-A M.R.S. §354.[12]

**B.      Maine's Response to the COVID-19 Pandemic**

The COVID-19 pandemic has given rise to an extraordinary set of circumstances in Maine and nationwide. In an effort to contain the virus and protect the public health, the State of Maine has implemented several emergency measures that, although perhaps reasonable in light of the public health crisis, make it incredibly difficult for Plaintiff and other citizens to lawfully or safely comply with the statutory procedures they must follow to participate in Maine's electoral processes. In particular, as a presidential candidate in Maine, Plaintiff is required by

---

[9] See, 21-A M.R.S. § 354(7)(A). Incidentally, Governor Mills waived this requirement for everyone other than candidate petition circulators.
[10] See, 21-A M.R.S. § 354(7)(B)&(C).
[11] See, 21-A M.R.S. § 354(8)(A).
[12] See, 21-A M.R.S. § 354(9).

law to obtain 4000 registered voters' signatures on petitions to qualify for placement on Maine's

November 3, 2020 general election ballot. Under the emergency measures and safety guidelines

now in place, however, it is incredibly difficult for Plaintiff to lawfully or safely comply with

these requirements.

In response to the virus' increasing presence in Maine, on March 15, 2020, Governor

Mills declared a State of Emergency. See Plaintiff's Exhibit 1. In her "Proclamation of State of

Civil Emergency to Further Protect Public Health," Governor Mills declared that COVID-19 is a

public health threat because it is a "highly infectious agent that poses an imminent threat of

substantial harm to our citizens." *Id*. Three days later on March 18, 2020, Governor Mills issued

Executive Order 14 FY 19/20 prohibiting gatherings of more than 10 people throughout the state

and closing all bars' and restaurants' dine in areas. See Plaintiff's Exhibit 2. The order made no

exception for First Amendment activity. *Id*. Then, on March 24, 2020, Governor Mills issued

Executive Order 19 FY 19/20, which further restricted commercial activity, restricted public

gatherings, and extended public social distancing requirements through more detailed regulation

of "essential" and "non-essential" businesses. See Plaintiff's Exhibit 3. Petitioning was not listed

as an essential activity under the Order. *Id*. Finally, on March 31, 2020, Governor Mills issued

Executive Order 28 FY 19/20 containing a "Stay at Home" Order, which ordered all persons

living in the State of Maine to stay at their homes except when leaving to conduct certain

essential activities. See Plaintiff's Exhibit 4. Petitioning was not listed as an essential activity

under the Order, and the Order remained in place until May 31, 2020. *Id*. Governor Mills' "State

of Civil Emergency" remains in place until August 6, 2020. See Plaintiff's Exhibit 5.

In addition to the measures listed above, Defendant has undertaken certain actions in

regards to Maine's elections that while done in a good faith effort to protect the citizens of

Maine, have had the unintended effect of further burdening Plaintiff's First and Fourteenth Amendment rights. First, Defendant encouraged voters to vote absentee in the July 14, 2020, primary elections and extended the deadline by which they could request absentee ballots. See Plaintiff's Exhibit 6. While done to mitigate the spread of COVID-19, this action caused Plaintiff to miss out on the lion's share of her petition signatures, which are typically gathered at tables within the polling the places on election days. Further, Defendant required petition circulators to remain outside while soliciting signatures at the polling places on primary election day. See Plaintiff's Exhibit 7. This not only had the unintended effect of greatly reducing the number of voters petition circulators could interact with, but also led to the destruction of several petitions already containing signatures due to the heavy rain that fell over most of Maine that day. See Declaration of Christopher Thrasher ¶ ¶ 8, 9; Declaration of James Tracey ¶ 3.

C.      **Plaintiff's Signature Gathering Efforts Hampered by the COVID-19 Pandemic and Maine's Response Thereto**

Third parties and independent candidates for president in a normal election year have access to significantly less resources, personnel, and equipment. Decl. Thrasher ¶ 3. Their campaigns rely on boots-on-the-ground volunteer work and community outreach. The COVID-19 outbreak has made the already arduous path to ballot access for third party and independent candidates for president much more difficult. Decl. Thrasher ¶ 4. First, petition signatures are typically collected during the spring and summer at public events and festivals. Decl. Thrasher ¶ 5. However, this year, due to the COVID-19 pandemic and ongoing social distancing mandates from Governor Mills, the vast majority of public events scheduled for the spring and summer in Maine were cancelled.[13] Second, general public reluctance to engage in the sort of physical

---

[13] Burnham, Emily; Bangor Daily News (April 29, 2020); *Here's a list of the Maine parades, festivals and concerts that have been scrapped for 2020*; (https://bangordailynews.com/2020/04/29/news/bangor/bangors-memorial-day-parade-has-been-canceled/).

contact required to sign a petition has resulted in many of Plaintiff's petition circulators being immediately rejected upon attempting to solicit signatures. Decl. Thrasher ¶ 6. Third, primary election day petitioning at the polling places typically represents an outsized portion of Plaintiff's signature gathering efforts, but this year those efforts were hampered by Governor Mills and the COVID-19 pandemic. Decl. Thrasher ¶¶ 7, 8; *See also* Plaintiff's Exhibit 7. The increased number of absentee voters resulted in far fewer individual voters traveling to the polls and thus far less voters signing petitions. Decl. Thrasher ¶ 8. Further, Governor Mills mandated that all petition circulators must stand outside the polling place instead of at their usual tables indoors. Plaintiff's Exhibit 7. This not only greatly hindered petition circulators ability to intercept and solicit signatures from voters, but given the heavy rain that fell across most of Maine that day, it led to the actual destruction of several petition sheets. Decl. Thrasher ¶¶ 7, 8, 9. Fourth, as a result of the COVID-19 pandemic and the Governor's executive orders in response, Plaintiff's campaign was unable to hire enough professional petition circulators and notaries. Decl. Thrasher ¶ 11. On more than one occasion, notaries and circulators refused to work citing that the Governor had not opened up the state to the public. *Id.* Additionally, on more than one occasion a petition circulator was denied a hotel room due to the ongoing restrictions. Decl. Thrasher ¶ 10. Fifth, Maine's requirement that signature petitions be turned into each individual town hall for certification prior to being turned in to the Secretary of State, has resulted in unnecessary difficulties and hampered Plaintiff's ability to turn in signatures during the COVID-19 pandemic. Decl. Thrasher ¶ 12. Due to the COVID-19 pandemic, many town halls are operating on reduced hours and interact with the public by appointment only, with many closed entirely. *Id.* Plaintiff's campaign has collected signatures from more than 285 towns, but as a result of the COVID-19 pandemic, ongoing social distancing restrictions, reduced hours,

8

reduced staffing levels, reduced capacity, and unpublicized closures at local town halls, the campaign has experienced significant delays and complications in receiving the certified petition sheets, which further reduces the amount of signatures that will be submitted to the Secretary of State. *Id*. Plaintiff's campaign began its efforts to collect petition signatures as soon as it was able, January 1, 2020; however, as a result of the above, Plaintiff's campaign was only able to collect 4,400 unverified petition signatures. Thus, Plaintiff believes, that absent relief from this Court, once signatures are verified, she will not have enough signatures to qualify her to appear on Maine's 2020 general election ballot.

**ARGUMENT**

**I.      Plaintiff is Entitled to Preliminary Relief.**

When making a request for a preliminary injunction, the Plaintiff must show that (1) she will suffer irreparable harm; (2) the remedies available to her at law are inadequate; (3) the harm to her outweighs the harm Defendant would suffer if an injunction were imposed; and (4) an injunction will not adversely affect the public interest. *Block v. Mollis*, 618 F. Supp. 2d 142, 155 (D.R.I. 2009). Of the four factors, the likelihood of success on the merits is of primary importance. *See Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits").

> **A. Plaintiff Will Suffer Irreparable Harm if the Court Does Not Grant Her Injunctive Relief**

Plaintiff urgently needs relief from this Court because she is required to obtain a statutorily prescribed number of voters' signatures on petitions by August 3, 2020, and if she fails to do so she will be excluded from Maine's November 3, 2020 general election ballot. At the same time, the ongoing COVID-19 pandemic and the State's orders made in response thereto, as described above, make it impossible for Plaintiff to gather enough signatures. Thus,

Plaintiff will suffer irreparable harm in the absence of injunctive relief. It is well-settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiff is suffering such harm now. "Petition circulation … is 'core political speech,' because it involves 'interactive communication concerning political change.'" *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)). First Amendment protection is therefore "at its zenith" with respect to Plaintiff's right to circulate petitions in support of her candidacy. *Id*.

### B.  Plaintiff Has a Strong Likelihood of Success on the Merits.

The extraordinary circumstances from which this case arise make it an easy one to decide. Under Maine law, as it now exists during the COVID-19 pandemic, it is virtually impossible for Plaintiff to collect enough signatures to qualify for the ballot, let alone to do so without risking her health or running afoul of social distancing requirements mandated by the State. In all six virtually identical cases that have reached a decision at the federal or state appellate court level, the courts have found that enforcing statutorily required signature requirements in order to secure a place on the ballot during the COVID-19 pandemic would place a severe and unconstitutional burden on the First Amendment rights of the parties and candidates seeking ballot access.. *Esshaki v. Whitmer*, 2020 WL 2185553, _____ Fed. Appx._____ (6thCir. May 5, 2020); *Libertarian Party of Pennsylvania v. Pritzker*, 2020 WL 1951687 (N.D. Ill., April 23, 2020);*Garbett v. Herbert*, 2020 WL 2064101 (D. Ut. 4/29/2020); *Goldstein v. Galvin* (Mass. SJC-12931) (4/17/2020); *Libertarian Party of New Hampshire, et al. v. Christopher T. Sununu, et al.*, No. 20-CV-688-JL, 2020 WL 4340308, at *23 (D.N.H. July 28, 2020)(reducing signature requirements for president by 35%); *Constitution Party of Virginia, et*

*al. v. Virginia State Board of Elections, et al.*, No. 3:20-CV-00349-JAG (E.D.VA. July 15, 2020)(reducing signature requirements for president by 50%). Plaintiff is also entitled to the relief requested because Maine's petitioning requirements, as applied here, cannot withstand constitutional scrutiny under the analytic framework the Supreme Court set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

> **1.   Plaintiff is Entitled to Relief Because Maine Has Failed to Provide Her With An Adequate Procedure for Qualifying for the November 3, 2020 General Election Ballot**

When states fail to provide candidates and parties with a procedure by which they may qualify for the ballot, the Supreme Court and lower federal courts have not hesitated to remedy the defect by placing candidates and parties on the ballot by court order. In 1976, for instance, several states provided no procedure for independent candidates to qualify for the ballot. In each of these states, independent presidential candidate Eugene McCarthy sought relief in federal court, and without exception the courts ordered that he be placed on the ballot. *See McCarthy v. Briscoe*, 429 U.S. 1317, 97 S. Ct. 10 (1976) (Powell, J. in Chambers) (placing McCarthy on Texas ballot); *McCarthy v. Askew*, 540 F.2d 1254, 1255 (5th Cir. 1976) (per curiam) (affirming order placing McCarthy on Florida's ballot); *McCarthy v. Noel*, 420 F. Supp. 799 (D. R.I. 1976) (placing McCarthy on Rhode Island ballot); *McCarthy v. Tribbitt*, 421 F. Supp. 1193 (D. Del. 1976) (placing McCarthy on Delaware ballot); *McCarthy v. Austin*, 423 F. Supp. 990 (W.D. Mich. 1976) (placing McCarthy on Michigan ballot). As Justice Powell observed in *McCarthy v. Briscoe*, the Supreme Court had followed the same procedure in 1968, when it ordered that several candidates who successfully challenged the constitutionality of Ohio's ballot access laws be placed on its ballot. *See McCarthy v. Briscoe*, *supra*, citing *Williams v. Rhodes*, 89 S. Ct. 1, 21 L.Ed.2d 69 (Stewart, J., in Chambers, 1968).

In 1980, Michigan had failed to enact a procedure for independent candidates to access the ballot following the decision in *McCarthy v. Austin*, *supra*, and two independent candidates running for president and vice-president filed suit. *See Hall v. Austin*, 495 F. Supp. 782 (E.D. Mich. 1980). Once again, a federal court ordered that the independent candidates be placed on Michigan's ballot. *See id*. at 791-92. The issue arose again in 1984, because Michigan still had not enacted a procedure for independent candidates to qualify for the ballot. An independent candidate for the State Board of Education filed suit, the district court again declared Michigan's ballot access scheme unconstitutional, and the Secretary of State was ordered to place the candidate on the ballot. *See Goldman-Frankie v. Austin*, 727 F.2d 603, 607-08 (6th Cir. 1984).

In *Williams*, the Supreme Court explained the rationale for federal courts to grant such relief: the Constitution does not permit states to restrict access to the ballot in a manner that "favors two particular parties – the Republicans and the Democrats – and in effect tends to give them a complete monopoly." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968)). Here, the State of Maine – albeit with the unwanted intrusion of a global pandemic – has accomplished that same result. Maine held its primary elections on July 14, 2020, and the Republican and Democratic nominees selected by means of that taxpayer-funded procedure are automatically qualified to appear on Maine's 2020 general election ballot. Yet it is partially unlawful – a violation of Maine's social distancing requirements – patently unsafe, and incredibly difficult for Plaintiff and all other independent candidates and parties to engage in petitioning, which is the only procedure that Maine provides for them to qualify for the general election ballot. Further, Maine's requirement that Plaintiff have her signatures verified at every individual municipality is not only unnecessary (state and local officials have access to the same databases) but poses an extreme burden when coupled with the fact that town halls across Maine are operating under

reduced hours if not closed altogether. Decl. Thrasher ¶ 12. The grounds for this Court's

intervention could not be clearer.

Maine did not cause the outbreak of the COVID-19 virus, of course, but that is

immaterial. Maine is constitutionally required to provide its citizens with a lawful, safe

procedure to qualify for its general election ballot, and it has failed to do so. Certainly, Maine

could have adopted measures to remedy this constitutional defect. Governor Mills has issued

several executive orders that impose sweeping changes to Maine law – and which incidentally

make it impossible for Plaintiff to qualify for Maine's November 3, 2020 general election ballot

– but Defendant has declined to provide *any relief* to independent candidates for office. Under

these circumstances, Plaintiff is entitled to injunctive relief from this Court.

### 2. Maine's Statutory Scheme Cannot Withstand Constitutional Scrutiny as Currently Applied

Plaintiff is also entitled to relief because Maine's statutory scheme, as currently

applied, cannot withstand constitutional scrutiny under the Supreme Court's *Anderson-Burdick*

analytic framework. Under that analysis, a reviewing court must:

> first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789. This framework establishes a "flexible standard," according to which

"the rigorousness of our inquiry into the propriety of a state election law depends upon the extent

to which a challenged restriction burdens First and Fourteenth Amendment rights." *Burdick*, 504

U.S. at 434*; Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017). Under this standard, "reasonable, nondiscriminatory restrictions" are subject to less exacting review, whereas laws that imposes "severe" burdens are subject to strict scrutiny. *Burdick*, 504 U.S. at 434 (citations omitted). But in every case, "However slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 128 S.Ct. 1610, 1616 (2008) (citation and quotation marks omitted); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995) ("We believe that a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational.").

As the Seventh Circuit has explained, "[m]uch of the action takes place at the first stage of *Anderson's* balancing inquiry," because the severity of the burden imposed is what determines whether strict scrutiny or a less demanding level of review applies. *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (citing *Burdick*, 504 U.S. at 534). Any burden treating independents as a suspect class for targeting is a severe burden. *Anderson*, 460 U.S. at 792.

Here, the burden imposed could not be more severe: Maine law as currently applied prohibits Plaintiff and all other independent candidates from seeking to qualify for the general election ballot without violating social distancing requirements and placing their lives in danger. Such "complete exclusion," the Seventh Circuit has concluded, constitutes a "severe" burden on the First and Fourteenth Amendment rights of the affected voters, candidates and parties. *Lee v. Keith*, 463 F.3d 768, 770 (7th Cir. 2006).

"Restrictions that 'severely' burden the exercise of constitutional rights must be 'narrowly drawn to advance a state interest of compelling importance.'" *Lee*, 463 F.3d at 768 (quoting *Burdick*, 504 U.S. at 434). But no state interest, compelling or otherwise, is sufficient to justify Maine's unequal treatment of independent candidates for office. In *Lee*, for example, the Seventh Circuit acknowledged that promoting political stability and preventing ballot clutter "are important state interests," but it found them insufficient to justify the challenged restrictions. *Id.* at 770-71. Such interests, the Court concluded, do not "'permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence,' and that is effectively what Illinois has done." *Id.* at 771 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 366-67 (1997)).

To be sure, Maine has a strong and even compelling interest in protecting the public health during a pandemic. But no court has ever upheld a ballot access restriction that categorically excludes all candidates except Republicans and Democrats. Because petition circulation has been made prohibitively difficult under Maine law, and Maine has failed to reduce the number of petition signatures independent candidates are required to gather, Maine's petitioning requirements are unconstitutional as applied to Plaintiff in the 2020 general election cycle.

### C.  The Balance of Harms Weighs Strongly in Plaintiffs' Favor.

The harm that Plaintiff will suffer in the absence of the requested relief is plain: her name will not appear on Maine's November 3, 2020 general election ballot; voters will be deprived of the opportunity to hear her political views and to associate with and support them; The Libertarian Party of Maine ("LPME") will be prevented from disseminating and building support for its platforms among the general electorate. The Supreme Court has expressly relied on such

15

harms to justify granting the relief that Plaintiff request here. *See*, *e.g.*, *Norman v. Reed*, 502 U.S. 279, 288-89 (1992); *Anderson*, 460 U.S. at 793-94; *Williams*, 393 U.S. at 30-31. The Court's admonition in *Williams* bears repeating:

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.

*Williams*, 393 U.S. at 31. This Court's intervention is amply justified to prevent such harm to Plaintiff's "most precious freedoms." *Id*. at 30.

By contrast, Defendant will not suffer any harm if the Court grants Plaintiff the requested relief. The LPME has qualified for Maine's general election ballot with regularity in past election cycles, and there is no evidence that Maine sustained any harm to its electoral processes as a result of their participation. On the contrary, as the Supreme Court has repeatedly observed, "[h]istorically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream." *Anderson*, 460 U.S. at 794; *see Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86 (1979); *Sweezy v. New Hampshire*, 354 U. S. 234, 250-251 (1957). Thus, the continued participation of Plaintiff in Maine's electoral process will benefit, not harm, Defendant and the voters of Maine generally.

Moreover, the relief that Plaintiff requests here is precisely the same relief that other states have granted of their own volition and neighboring courts have ordered. On March 30, 2020, for example, Vermont enacted legislation providing that "a person shall not be required to collect voter signatures in order to have the person's name placed on any ballot in the year

2020."[14] Every federal court that has addressed this issue so far has found that signature requirements for ballot-access impose severe burdens on candidates' rights during the time of this pandemic. *See Garbett v. Herbert*, Civ. No. 2:20-cv-245-RJS, 2020 WL 2064101 at *12 (D. Utah May 1, 2020); *Libertarian Party of Ill. v. Pritzker*, Civ. No. 1:20-cv-2112, 2020 WL 1951687 at *4 (E.D. Ill. April 23, 2020); *Esshaki v. Whitmer*, Civ. No. 2:20-cv-10831, 2020 WL 1910154 at *6 (E.D. Mich. April 20, 2020), *aff'd in part and reversed in part*, No. 20-136, 2020 WL 2185553 at *1 (6th Cir. May 5, 2020)("The district court correctly determined that the [ballot-access restrictions] imposed a severe burden on the plaintiffs' ballot access, so strict scrutiny applied…"). One state court that applied an analogous framework similarly found a severe burden. *See Goldstein v. Secretary of the Commonwealth*, 125 N.E.3d 560, 571 (Ma. 2020). In Virginia, a federal court found that the state's signature requirements for candidates for president unconstitutionally burdened the candidates' First Amendment rights during the COVID-19 pandemic and lowered those requirements by 50%. *Constitution Party of Virginia, et al. v. Virginia State Board of Elections, et al.*, No. 3:20-CV-00349-JAG (E.D.VA. July 15, 2020). In New Hampshire, a federal court found the same and lowered those requirements by 35%. *Libertarian Party of New Hampshire, et al. v. Christopher T. Sununu, et al.*, No. 20-CV-688-JL, 2020 WL 4340308, at *23 (D.N.H. July 28, 2020). This Court should likewise conclude that Maine's signature requirements impose a severe burden under current circumstances and reduce the requirements.

Further, Maine requires that candidates for the U.S. House of Representatives only turn in 2,000 verified signatures in order to qualify for the ballot.[15] If 2,000 signatures are enough to

---

[14] *See* An Act Relating to Government Operations in Response to the COVID-19 Outbreak, HB 681 (2020), available at https://legislature.vermont.gov/Documents/2020/Docs/BILLS/H-0681/H 0681%20As%20Passed%20by%20Both%20House%20and%20Senate%20Official.pdf (accessed June 5, 2020).
[15] See, 21-A M.R.S. § 354(5)

certify that candidates for the House have a sufficient modicum of support, then 2,000 should be plenty to establish the same for candidates to the presidency. Indeed, state imposed restrictions implicate a unique burden in the context of presidential elections because those burdens have implications on the voting rights of individuals both within and beyond the state. *Anderson*, 460 U.S. at 794–95. Such national interests are greater than the interest of any individual state. *Id.*

In addition, other states similar to Maine in size require far less signatures for presidential candidates.[16] No signatures are required in Colorado or Louisiana; neither has experienced any voter confusion from too many candidates on the presidential ballot. *Id.* Tennessee only requires 275 signatures in a state more than four times larger than Maine; it has never experienced any voter confusion from too many candidates on the presidential ballot. *Id.* Proportionate to the population, only seven states in the nation impose higher signature requirements on independent presidential candidates, and none of the 42 states with fewer signature requirements per capita have ever experienced any voter confusion from too many candidates on the Presidential ballot. *Id.* Indeed, the average signature requirement for the states approximates the 2,000 signature requirement Maine recognizes as sufficient for candidates to the U.S. House of Representatives. *Id.*

No harm will come to Defendant or the State of Maine if the Court grants similar relief here. On the contrary, Defendant will be relieved of the considerable burden of validating 4,000 petition signatures during the crunch of the election cycle. The balance of harms therefore weighs strongly in Plaintiff's favor.

### D. The Requested Relief Is in the Public Interest.

Preliminary relief will benefit the public because it will protect the First Amendment

---

[16] https://ballotpedia.org/Ballot_access_for_presidential_candidates

rights of Maine voters to cast their votes effectively and to associate with candidates and parties they support. "Injunctions protecting First Amendment freedoms are always in the public interest." *American Civil Liberties Union of Il. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) (footnote omitted)).

Plaintiff suspects that Defendant will argue that lowering the signature requirement for independent candidates will result in an "overcrowded ballot" or confusion at the polling place. However, Defendant's fears are misguided. There has never been a *single instance* of voter confusion from an overcrowded ballot in neither Maine nor the country's history. In fact, states have held elections with dozens of candidates and no resulting confusion.[17]

This factor therefore also weighs in Plaintiff's favor.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully moves the Court to issue preliminary relief.

---

[17] The 2003 California Gubernatorial recall election is an instructive example. In that election 240 candidates turned in filing papers and 135 qualified to appear on the ballot. The election went forward without a hitch resulting in the election of Arnold Schwarzenegger. PBS (August 14, 2003) California Certifies 135 Candidates in Recall Election. (https://www.pbs.org/newshour/politics/politics-july-dec03-recall_08-14). Plaintiff strongly believes that Mainers are just as capable of conducting an election.

Respectfully submitted,

MAHANY LAW PARTNERS LLC

/s/ Brian Mahany
Brian Mahany, Bar #003269
8112 W. Bluemound Road, Ste 101
Wauwatosa WI 53213
(414) 258-2374 – Office
(414) 704-6731 – Direct
brian@mahanylaw.com
*Local Counsel for Plaintiff*

BARNES LAW, LLP

/s/ Robert E. Barnes
Robert E. Barnes, CA SBN #235919
*Pro Hac Vice to be filed*
5251 Highway 153, Suite C #354
Hixson, TN 37343
(310) 510-6211 – Main
(310) 510-6225 – Fax
robertbarnes@barneslawllp.com
*Attorneys for Plaintiff*